Thank you very much. Good morning, gentlemen. As you can see, we are missing one person in person, but I hope that Judge Canby is on the phone. Are you on the phone, Judge Canby? Yes, and I appreciate the accommodation. I hope counsel can put up with it. I just couldn't be in San Francisco today, and the alternative would have been months of delay, so we're doing it this way. All right. With that, we'll hear from the appellant. May it please the Court. Good morning, Your Honors. Both Mr. and Mrs. Addis and Dr. Weiner made substantial contributions to the National Heritage Foundation, a qualifying charity. The Addises, to pursue their Christian endeavors. Dr. Weiner, medical research. Through the split-dollar arrangement, they attempted to create substantial endowments for the future. Dr. Weiner, potentially an over $3 million endowment. Mr. and Mrs. Addis, over $500,000. The charities under these arrangements, under the split-dollar agreements, had guaranteed amounts under these contracts. So if and when, and we knew they were going to die, they would get these monies. That is what the charities were interested in, building long-term value. Now, we believe the tax court made an error in concluding that the taxpayers received goods and services, and therefore, there was a violation of a substantiation provision, section 170F8. We don't believe there were goods and services provided in consideration for the contributions. The court simply analyzed the amount of the death benefit versus the relative premium paid. And that was the improper way to have to look at the transaction. The death benefit received by the Addises and Dr. Weiner was a fraction of their own premium contributions. In the Addises, the record was clear. The cost of the benefit, the death benefit coverage, was approximately $748. The Addises paid $4,000. They covered their cost of the death benefit coverage. In Dr. Weiner's case, the death benefit coverage, there were various ways to do it, but it was no more than an average of $4,500, and he contributed approximately $7,200 in non-deductible premiums. Counsel, I have a question, and that is that in this kind of a policy, the accumulated cash values over a long period of time get to be very great. The charity had a right to cash value, but was there an upper limit on that right? Yes, Your Honor. There was, in the long run, an upper limit on that right. During the earlier years, and for the, depending upon what projections you looked at, it was the charity, however, which had all or substantially all of the cash surrender value. If, in fact, the policies performed above the guaranteed rates, then yes, there might be an upper limit, and that performance element would go to the taxpayers. And that's the key here. The charities got the guaranteed death benefit. If the value, if the policies didn't perform, they still got their $3 million or $500,000. The taxpayer gave up the guarantee, guaranteed to keep this policy in force, and if the policy did perform, yes, there could be an upper limit on the, what the charities would receive. Mr. Drennan, we ought to start with consideration. What do you understand consideration to mean? Consideration, Your Honor, it's Mr. Tosher. Mr. Drennan was my co-counsel. Oh, I'm sorry. That's quite right. The consideration in this case means something of value coming back in consideration for the payment. You know, more than a pepper. And it can come back immediately or in the future, can it not? No. I think if it was going to come back in the future with respect to a specific premium contribution, yes, under the regulations, it could come back. Well, you know the standard view of consideration. I don't see that the law here is any different. It's anything that is done by a promisee and a contract. The charity was going to do the accounting for the donors, wasn't it? Excuse me, Your Honor? The charity was going to do the accounting. It was going to pay the premiums. That's correct, Your Honor. Wasn't that something? Wasn't that a service? The charity was paying the premiums for each share. No, no, but it was going through, taking the steps to know when the payments had to be made and making them. Wasn't that a service? No, I wouldn't think that because it is not in consideration. The charity was doing it because it was investing in the split dollar arrangement. Sure, but it was also a service to the donors. Your Honor, I... Well, how could he get around it? Excuse me? How do you get around that? Because I don't think that was... they were doing it for their own independent reason. Well, sure, but they were doing it as a service for the donors. That would give them a chance. It doesn't change the fact that they got a benefit. It doesn't change that the donors got a benefit. I think that would mean that anything the charity would do, a church putting a name on a building... Well, that may be. But that's not the law. Well, I don't know. The law says you've got to get a certificate, but nothing of value, no consideration has been given. And the charity believed no consideration had been given. Well, that's clear. What facts, Your Honor, whether some charity... And I appreciate the honor, Your Honor, and we are now dissecting these facts in hindsight, but I would ask, Your Honor, to go back as to when this was happening, and was there consideration being given? The charity was investing for its reasons. The taxpayer was investing for its reasons. The fact that you're getting a benefit out of something doesn't mean that you're not doing a benefit to somebody else. That's true, that there could be a benefit. The question is, was there consideration flowing back for this payment? And I submit there was not. The only significant benefit was the death benefit coverage. Why do you focus on the death benefit? There are other aspects of an insurance policy. Because that is the substantial benefit received. The charity doing bookkeeping, I would think, would come in with the exception of insubstantial benefits. Well, that exception of insubstantial is that there's a fundraising campaign going on. I don't think it's just so limited to that, Your Honor. Well, that's... What's that? There's a regulation on that? No, you've got to deal with the regulations when you're dealing with taxes. Well, I appreciate the Court's concern, but the thrust of the decision... I appreciate the Court's inquiry, but the analysis of trying to pick a peppercorn of consideration to invalidate a substantial contribution is not what's called for under the regulations and produces absurd results. Well, you know, we start with the words of the statute. We follow the words of the regulation. We don't speculate. You may not like peppercorns, but peppercorns maybe. But that was just a sample. When we go through this, I'll tell you right now, there are all kinds of benefits flowing from the charity to the taxpayer, and to pretend that there's only the death benefit involved is just a pretense. Well, Your Honor, I wasn't pretending that was only the death benefit. Well, look at some of the other benefits that go with a life insurance policy. There is the cash value buildup, the investment element. There is the ability to borrow. I think we did a fair job of going through those elements and pointed to that if you look at the contracts, that the charity had its benefits and burdens under that contract, and the taxpayer had its benefits and burdens. And if you evaluate both of those, okay, was the charity giving back something to the taxpayer? And we think not. Now, the only evidence of an overall valuation of the relative rights of the policies was in the expert testimony of Jeff Cohn in the Weiner case. The court held that he didn't have to rule on the invisibility, so I think it's before this court. The opinion states that if the charity had to go out and purchase a similar guaranteed policy, they would be paid much more than what they paid in their contributions on the policy. The problem is, all the tax court did was evaluate the premium contribution and the death benefit. And that, we submit, is clearly wrong in determining what is the solution going down. The tax court decided that, assuming there was consideration, he found there was consideration, that that invalidates the contribution under 170F8. The regulations in the code aren't clear as to the consequence of the receipt being erroneous. The tax court created, there really is no law on this, standards saying that if the receipt is erroneous and if the charity was not in good faith and if the taxpayer was unreasonable in relying upon that, then I'm disallowing everything, regardless of the fact that there was substantial value given to the charity. Under the tax court's own standards, and there could be a different rule, it doesn't mean that it would have to be a full disallowance. They got the receipt. But let's assume we go with the tax court's standard. The record is clear. There's no evidence the charity was in anything other than in good faith. And there's no evidence the taxpayers didn't reasonably rely upon this. We can dissect it today and look at, well, we had this potential benefit, this potential issue, but overall the belief was they were creating substantial charitable endowments and they were not getting something in return. The tax court described it as a scheme. That's a label. There's no fact supporting it. That was the tax court's view of it. And there was no support for it. We have about four minutes left. Do you want to save some for him? Yes, Your Honor. I think we have your argument, Pan. Thank you. Thank you. Good morning, Your Honors, and may it please the Court. The first issue in this case is whether NHF's acknowledgement was required to state that NHF used these contributions or claims. Counsel, can you be careful to be near the microphone? Let me try to pull it a little closer. That's very good. Is that better? That's fine. Okay. And I'll speak up a bit. The first issue in this case is whether the NHF's acknowledgements were required to state that NHF used these contributions from the taxpayers to pay premiums on insurance policies that were owned by the taxpayers' trusts. Now, the statute and regulations both require that the acknowledgments state whether, and the key language is any goods or services were provided in consideration for a contribution, not whether the donor received a net benefit after netting together a series of what are essentially sort of reciprocal transactions. And I'll use the facts of Weiner to illustrate where Weiner made a contribution of $93,000. That was paid over on an insurance policy owned by his trust, which there was a preexisting agreement whereby when that payment was made, the trust then sold rights to NHF. So you've got money flowing from the taxpayer to NHF, to an insurance company, back to the trust, and then back to NHF. And the key there, we think, as a threshold matter, is that the insurance rights and other rights attributable to the $93,000 payments on the premiums are not the same as the rights that the trust transferred back to NHF. In other words, the trust got something from these $93,000 payments that it kept. And the tax court focused on the current year's death benefits. The taxpayer got 41 percent of the death benefits but paid 7 percent of the premium. Of course, the reason it got 41 percent of the death benefits is that the parties divided up these rights in a manner that wasn't in proportion to their payments. But the situation is much, much clearer with respect to other rights, such as the right to earnings on this $93,000. And there's no way the trust can get a right to earnings, you know, contingent or otherwise, subject to diminution in the future, however one wants to characterize it. You can't get a right to earnings on $93,000 with a $7,000 contribution. They got that as a result of that payment. That has to be disclosed. If any goods or services received in consideration for the contribution has to be disclosed and described as well as valued. And continuing on with the- Well, I gather your opponent essentially argues that's a hyper-technical requirement and that using the old familiar saw that you folks usually use, you have to look at the substance of the transaction rather than the requirement. What's your response to that? Well, the language of the statute is abundantly clear. If any goods or services provided, it doesn't say any goods or services as reduced by whatever the taxpayer may have given back. The language is not susceptible of that latter interpretation. It's really abundantly clear. One year after the year in issue, you had a positive cash surrender value over and above what was owed to NHF of $50,000. And you can say that's because it was a good year in the stock market. But our response, of course, is it's a good year in the stock market on what investments? The $93,000. You can't get a right to earnings on $93,000 if you're only paying $7,000 towards the policy. That's what they got. That has to be disclosed. And, of course, with respect to future death benefits, whatever those death benefits turn out to be, they're going to be greater with $93,000 having been paid than without $93,000 having been paid. So going back, again, to the language of the statute, the language of the regulations, any goods or services given as consideration has to be included in the acknowledgment. And you can't take that transfer of property to the taxpayer, the $93,000 premium payment, and then reduce it by saying, well, we gave other property back. If there's nothing, as we see it, the statute simply doesn't allow it by its own terms. The good faith exception deals with reliance on an acknowledgment. For the value of property only, the statute contains three requirements. The charity has got to disclose the property given, describe it, and value it. Now, there are two requirements there, the disclosure and the description, which simply aren't satisfied. In this case, you don't even get to the question of good faith reliance on value because there are other statutory requirements that simply aren't satisfied. Now, we have an alternative contention in this case, and that is that the substance going to the substance of the transaction is actually a gift of a partial interest in an insurance policy. The substance of a reform doctrine has been observed very well established in the tax law. It's been called the cornerstone of sound taxation. It's been described as being something in the nature of a preamble to the code within which all of its provisions operate. The substance of this, to really boil our contention down, what it really comes down to is if you, instead of making a gift of partial interest in property to a charity, you say to the charity, I'm going to sell it to you, but by the way, here's the money to make the purchase. What you've really done is make a gift of a partial interest in an insurance policy. And there is legislative history on a later amendment to Section 170, which came into effect a year after the year of the issue, where Congress said exactly that, that if a contribution is made, the contribution is used as a premium on an insurance policy in which the taxpayers or related parties get some rights, and the charity also gets rights, that the substance of that is a transfer of a partial interest in an insurance policy, 170F3 prohibits the deduction of anything less than the taxpayer's entire interest in property, with some minor exceptions that are not applicable here. So if you go out and you buy property for the purpose of selling a partial interest to a charity, and then you give the charity, instead of giving it to the charity, it would be the one-stop direct transaction. You say, well, I'm going to sell it to you, but here, by the way, is the money to make the purchase. You boil that down, what you get is a gift of a partial interest in an insurance policy. That's the substance of a reform doctrine that also reflects Congress's description of these sorts of transactions. I realize I have time left, and I'd be happy to go into any topics the Court would like, but unless the Court has questions, those were the major points that I'd hope to make, and I have nothing further. None here. All right. Thank you for your argument. Thank you. May it please the Court? Just a few points in closing. We strongly disagree with the government's interpretation of any goods and services. The purpose of that substantiation is to show if there is value coming back, how the charitable contribution would be reduced. We believe in the fact, though, there was no value of goods and services coming back, so there would be no reason to interpret that statute that way. It's a technical argument, any goods. I've never read anything on net benefit reciprocal transfers in any of the code regulations literature. It is a good argument. It's a clever argument, but it's not what you would get out of a normal reading of the code and the regulations. If there wasn't value coming back, there's no reason to put anything on that acknowledgement. Counsel, you're paying, I think the premium, at least in one instance, 7,000-some dollars. If you paid only $7,000 for this kind of an insurance policy, wouldn't you wind up with considerably less than you have under the arrangement that was used? You'd have less of a death benefit. You would have less of recovery of potential earnings. You'd have less possibility of cash value in excess of the limit going to the charity. Your Honor, no, I don't know that for a fact. I think for the we know the death benefit coverage was $4,500. Could the taxpayer have gone out and bought an equity option for the other amount and had the equivalent possible upside? That wasn't before the court, and I would just be speculating, but I can't say that they would do better on that. If, in fact, there was value coming back, the tax court did set a standard under 170F8. That was their conclusion. He was writing on an empty slate, good faith, unreasonableness of the taxpayer. If that's the test, and we submit that's what the tax court found, there is absolutely no evidence of anything but good faith on every party's part. After some draconian disallowance under 170F8, the long-term rule is that if there was value coming back under the Supreme Court's decision in American Bar Endowment, you would reduce the charitable contribution, not disallow everything on a technical substantiation requirement. With respect to the substance over form argument, this transaction relied upon long-established precedent that if the charity could do what they wanted with that premium, didn't have legal obligation, then you would not collapse the transaction. The substance over form doctrine has varied prongs and types of applications. It's just not a one-size-fits-all. In the charitable contribution area, it's been the legal obligation test. Since Palmer, years of pellet litigation, the government threw in the towel. I have nothing else to say, Your Honor. Thank you. Thank you both for your arguments and for your briefs. We appreciate you both traveling to San Francisco today. The case that's heard will be submitted. Thank you, Your Honors. Judge Thomas? We'll call you back, Judge Campbell. Thank you. Thank you, Your Honor.
judges: Canby, Noonan, Thomas